**THE BANK OF NEW YORK and JCPL Leasing Corp., Plaintiffs,**

v.

**MERIDIEN BIAO BANK TANZANIA LIMITED, Meridien International Bank Limited, Zambia Airways Corporation Limited, Meridien BIAO Bank Zambia Limited, Meridien BIAO Bank GmbH, Meridien BIAO Bank Meridien Aviation SAZF, Meridien BIAO Bank Liberia Limited, Meridien Aviation SAZF, Meridien BIAO SA, ITM International SA, Stanbic Bank Tanzania Limited, Techpro Mining and Metallurgy Limited, Volunteers in Technical Assistance, FAO Credit Union of Rome, Italy and "John Doe", "Jane Doe", "XYZ Corp." and "ABC Partnership" A through Z,**

---

said names being fictitious and unknown to Plaintiffs, the persons or parties intended being individuals or entities who may claim an interest in the property interpleaded herein, Defendants.

No. 95 Civ. 4856 (SS) (JCF).

United States District Court,
S.D. New York.

March 21, 1997.

Daniel Wallen, Richard G. Haddad, Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for plaintiffs.

Lawrence Kill, Jordan W. Siev, Anderson, Kill & Olick, P.C., New York City, for Meridien BIAO Bank Tanzania.

Melvin A. Brosterman, David Bolton, Deborah A. Biegel, Stroock & Stroock & Lavan, New York City.

David Mark, Rosenman & Colin, LLP, New York City.

P. Gregory Schwed, Loeb & Loeb, New York City.

Jeffrey Sabin, Marcy Harris, Schulte Roth & Zabel, New York City.

David Gikow, Lehman & Gikow, P.C., New York City.

## MEMORANDUM AND ORDER

JAMES C. FRANCIS, IV, United States Magistrate Judge.

This diversity case arises out of a purported $15.15 million pledge of accounts made by defendant Meridien BIAO Bank Tanzania Limited ("Meridien Tanzania") to The Bank of New York and JCPL Leasing Corp. (collectively "BNY") to secure certain obligations of Meridien International Bank ("Meridien International"). Defendant Deposit Insurance Board ("DIB") is the assignee of Meridien Tanzania. The parties have each submitted motions to compel the production of certain documents and for sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure. BNY also seeks a default judgment for DIB's alleged failure to comply with prior discovery orders of the Court. In addition, the parties have presented for resolution a dispute concerning the location for the deposition of a witness, Oran Njeza.

### Background

Meridien Tanzania was formed in late 1993 and opened an account with BNY in July 1994. As a condition for opening the new account for Meridien Tanzania, BNY requested that Meridien International, a related banking entity, provide BNY with an authorized signature list for Meridien Tanzania. Soon thereafter, Meridien International furnished BNY with an "authorized signature book," which purportedly contained the names of those Meridien Tanzania employees with authority to bind it contractually.

During this time, Meridien International sought overdraft facilities from BNY. BNY claims that it provided such facilities to Meridien International after requesting that Meridien Tanzania pledge its accounts as security. This pledge was allegedly executed in an agreement signed by P.S. Thomas, the Managing Director of Meridien Tanzania (the "Pledge Agreement"). BNY asserts that in reliance on the Pledge Agreement, it supplied Meridien International with credit accommodations aggregating $15.15 million, all of which were secured by funds maintained in the Meridien Tanzania account. Amended Complaint ¶ 22, attached as Exh. 1 to the Affidavit of Jordan W. Siev in Support of the Motion of the Deposit Insurance Board to Compel the Production of Documents from and for Sanctions against Plaintiff The Bank of New York dated January 17, 1997 ("Siev Supporting Aff.").

DIB contends that the Pledge Agreement established no obligation on the part of Meridien Tanzania to guarantee Meridien International's obligations to BNY because the agreement contains only the signature of Mr. Thomas, and therefore cannot create liability on the part of Meridien Tanzania. According to DIB, the authorized signature book requires not one, but two authorized signatures from Meridien Tanzania representatives in order to legally bind the bank. See Defendants' Answer to Amended Complaint, Counterclaims, and Cross-Claims ("Counterclaims") ¶¶ 11–12, attached as Exh. 2 to Siev Supporting Aff. Moreover, DIB asserts that BNY's actions failed to conform to accepted banking industry customs and practices as well as the bank's own internal policies and procedures for client signature verification.

On March 28, 1995, BNY liquidated the accounts Meridien Tanzania had purportedly pledged in satisfaction of Meridien International's indebtedness. BNY filed its Amended Complaint on June 13, 1996 seeking a judgment declaring that the Pledge Agreement was valid, and permitting the bank to keep the proceeds of the Meridien Tanzania accounts. DIB counterclaimed for the monies in the account, and cross-claimed against Meridien International and Meridien BIAO Bank GmbH for money damages and other relief.

### Discussion

#### A. The DIB Motion

DIB is seeking to compel the production of five BNY documents: (1) the Credit Policy Manual; (2) the Authorized Signature Book; (3) the Audit Review and Monitoring of Operational Risks (ARMOR) Audit Group Procedures Manual; (4) the Internal Auditing

Manual; and (5) the Operations Manual (collectively the "Disputed Documents"). DIB argues that BNY should have produced the Disputed Documents in response to DIB's First Document Request dated October 6, 1995, but failed to do so despite offering no specific objections to the relevant requests. *See* Memorandum of Law of the Deposit Insurance Board in Support of its Motion to Compel the Production of Documents from and for Sanctions Against Plaintiff The Bank of New York ("DIB Supporting Memo") at 6. DIB is also seeking to compel the production of various documents orally requested by DIB at certain depositions of BNY witnesses (the "Deposition Documents"). In addition, DIB seeks to compel the redeposition of witnesses who have knowledge of the circumstances surrounding BNY's late production of portions of the Operations Manual and various documents responsive to DIB's other document requests (the "Deposition Witnesses"). Finally, DIB asserts that BNY's conduct is sanctionable under Rule 37. As a remedy, DIB asks that the Court make conclusive findings that BNY had no valid basis for making the Pledge Agreement based on the signature of only one authorized Meridien Tanzania representative and that BNY did not follow its own internal policies and procedures for verifying signatures. DIB further seeks an award of costs for the expenses it incurred in deposing the Deposition Witnesses and in making the instant motion. I will address each of these issues in turn.

### 1. *The Disputed Documents*

#### a. *Relevance*

Rule 26 authorizes parties to obtain "discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action," and all information "reasonably calculated to lead to the discovery of admissible evidence." Fed. R.Civ.P. 26(b)(1). The Supreme Court has interpreted this rule broadly. *See Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978); *Hickman v. Taylor,* 329 U.S. 495, 507–08, 67 S.Ct. 385, 391–92, 91 L.Ed. 451 (1947). In this case, DIB has alleged that BNY breached its contractual, fiduciary, and common law duties to Meridien Tanzania by

accepting the Pledge Agreement with only one authorized signature from a Meridien Tanzania representative, and by improperly seizing various accounts and assets of Meridien Tanzania following the default on the Meridien International loan. Counterclaims ¶¶ 21–51. The defendants also assert that this situation was precipitated by BNY's failure to follow its explicit internal policies and industry custom. Counterclaims ¶¶ 21–35.

According to BNY, the Internal Audit Procedures Manual, the Credit Policy Manual, and the Authorized Signature Book "collectively indicate BNY's credit policies, provide a specimen signature for its officers, and demonstrate how BNY's internal audit procedures are developed to prevent fraud." Letter of Richard Haddad dated October 15, 1996 ("October 15 Letter") at 8, attached as Exh. 10 to Siev Supporting Aff. It is certainly plausible that these internal manuals will lead to discoverable evidence regarding how and why BNY extended overdraft facilities to Meridien International based on the alleged pledge of accounts provided by Meridien Tanzania. Moreover, the ARMOR Group Procedure Manual, which describes the internal procedures and criteria BNY follows to monitor various accounts for fraud, and the Operations Manual, which details BNY's internal signature verification procedures, may also contain information that DIB would utilize in proving that BNY should not have executed the Pledge Agreement with the signature of only one Meridien Tanzania representative. The Disputed Documents are therefore relevant to DIB's counterclaims. Moreover, BNY has stated its willingness to provide the defendants with this information pursuant to a mutually agreed upon Confidentiality Agreement.

Nevertheless, BNY contends that the Disputed Documents were not responsive to the First Document Request, and that any arguably responsive portions of those documents have already been produced. Memorandum of Law of The Bank of New York in Opposition to Motion to Compel the Production of Documents and for Sanctions ("BNY Opposition Memo") at 9–10. However, the First Document Request was broad enough to en-

compass the Disputed Documents. For example, requests three, six, seven, and twelve solicited:

3. All documents concerning (a) any borrowings by or indebtedness of Meridien International to BNY, (b) BNY's alleged reliance on the Pledge Agreement in providing Meridien International with any credit accommodations, and (c) Meridien International's alleged inability to repay its borrowings or indebtedness to BNY.

. . . . .

6. All documents concerning BNY's standards, practices, procedures, instructions, guidelines, policies or customs concerning pledges by any person of his, her o[r] its assets to secure either (a) his, her or its own debt or (b) the debt of a third party. ·

. . . . .

7. All documents concerning BNY's consideration of the United States or New York banking industry's standards, practices, procedures, instructions, guidelines, policies or customs concerning pledges by any person of his, her o[r] its assets to secure either (a) his, her or its own debt or (b) the debt of a third party.

. . . . .

12. All documents concerning any BNY internal operating standards, policies, procedures, practices, customs, instructions or guidelines concerning the procedure to be followed in verifying the authenticity of or number of signatures required on documents signed or executed by customers of BNY's including, but not limited to, pledges, guarantees, surety contracts, letters of credit and any posting of collateral.

*See* First Document Request, attached as Exh. 4 to Siev Supporting Aff. The Disputed Documents, which contain various BNY credit policies and internal auditing procedures used to prevent fraud and misappropriation of information in transactions with clients, are partially responsive to the above requests. While the relationship between the Disputed Documents and DIB's requests may not have been fully apparent to BNY when it received the First Document Request, BNY should have erred on the side of caution and explicitly objected to the production of these documents on the grounds of relevance and confidentiality, rather than simply failing to disclose them on the ground that they were unresponsive. *See generally Wilson v. The New York City Housing Authority*, No. 96 Civ. 1765, 1996 WL 524337, at *2 (S.D.N.Y. Sept.16, 1996) ("A request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action.").

### b. *Sanctions*

■ While BNY should have been more diligent in providing discovery to DIB regarding the Disputed Documents, I do not find that its actions rise to the level of sanctionable conduct. Pursuant to Rule 37, "[i]f a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just." Fed. R.Civ.P. 37(b)(2); *see also Dimensional Sound, Inc. v. Rutgers University*, No. 92 Civ. 2350, 1996 WL 11244, at *3 (S.D.N.Y. Jan.10, 1996) ("Rule 37 sanctions are intended to ensure that a party does not benefit from its failure to comply [with discovery]."); *Monaghan v. SZS 33 Associates, L.P.*, 148 F.R.D. 500, 508–09 (S.D.N.Y.1993). It is well settled that the Court has broad discretion to determine the type of sanction, if any, to impose upon a party, based on all the facts of the case. *Dimensional Sound*, 1996 WL 11244 at *3; *see also* Advisory Committee Notes to Rule 37 ("[T]he rule provides the court with a wide range of ... sanctions—such as declaring specified facts to be established [and] preventing contradictory evidence.").

■ In the instant case, I have not previously issued any order requiring BNY to comply with DIB's particular discovery requests concerning the Disputed Documents. "This [factor] alone militates against the entry of sanctions at this time." *Factor v. Mall Airways, Inc.*, 131 F.R.D. 52, 55 (S.D.N.Y.

1990).[1] In addition, contrary to DIB's assertions, there is no evidence that BNY acted in bad faith or attempted to mislead DIB by withholding the Disputed Documents when responding to the First Document Request. Nor do I find that BNY's confidentiality concerns are a "newly invented justification" for preventing DIB from preparing its case. As a result, sanctions against BNY are not warranted. *See generally Smith v. Conway Organization, Inc.*, 154 F.R.D. 73, 78 (S.D.N.Y. 1994) (it is within Court's discretion to deny sanctions award if objections to discovery were "substantially justified"). However, BNY must produce the Disputed Documents in their entirety, subject to a confidentiality order as outlined below.

### c. *Confidentiality*

BNY asserts that the Disputed Documents "are among its most proprietary manuals." Affidavit of Maria M. Patterson in Opposition to Defendants' Motion to Compel the Production of Documents and for Sanctions dated February 3, 1997 ("Patterson Aff.") ¶ 8; BNY Opposition Memo at 8. BNY also claims that it goes to great lengths to safeguard the confidentiality of the manuals, maintaining strict rules for their distribution to bank employees and third parties. Patterson Aff. ¶¶ 6–7; BNY Opposition Memo at 8–9. Moreover, BNY contends that disclosing the complete manuals would be detrimental to its business, since it would be placed at a severe competitive disadvantage if BNY competitors secured the information contained in them. Patterson Aff. ¶¶ 9–10; BNY Opposition Memo at 8–9.

■ The Federal Rules of Civil Procedure provide the trial judge with the discretion to determine whether to limit the boundaries of discovery "in light of the relevant facts and circumstances of a particular case." *Gelb v. American Telephone and Telegraph Co.*, 813 F.Supp. 1022, 1034 (S.D.N.Y.1993) (citation omitted). For example, Rule 26(c) states, in relevant part, that

> [u]pon motion by a party ... and for good cause shown, the court ... may make any

order which justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense, including ... that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way.

■ The moving party must establish that the information sought is confidential. *Sommer v. Aronow*, No. 95 Civ. 9230, 1996 WL 399820, at *2–3 (S.D.N.Y. July 16, 1996). In addition, the Second Circuit has made clear that

> [a] plain reading of the language of Rule 26(c) demonstrates that the party seeking a protective order has the burden of showing that good cause exists for issuance of that order.... [I]f good cause is not shown, the discovery materials in question should not receive judicial protection and therefore would be open to the public for inspection.... Any other conclusion effectively would negate the good cause requirement of Rule 26(c).

*In re "Agent Orange" Product Liability Litigation*, 821 F.2d 139, 145–46 (2d Cir.1987) (internal citations omitted). Under Rule 26(c), the moving party is required to establish good cause by a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Havens v. Metropolitan Life Insurance Co.*, No. 94 Civ. 1402, 1995 WL 234710, at *10 (S.D.N.Y. April 20, 1995) (quoting *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir.1986)); *see also* 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2035 (1994). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Cipollone*, 785 F.2d at 1121. Instead, the party resisting discovery must prove that disclosure of the confidential information will result in a "clearly defined and very serious injury to its business." *Gelb*, 813 F.Supp. at 1034 (quotations omitted).

---

1. Since BNY did not violate a specific discovery order, it is inappropriate to grant DIB's request for a Rule 37(b)(2) order that would conclusively establish specified facts relating to the Pledge Agreement and BNY's conduct in obtaining the agreement.

It is clear that the materials at issue here may be subject to a protective order. The Disputed Documents are various manuals that fall within a broad spectrum of internal corporate documents that courts regularly hold to be confidential business information. *See, e.g., American Standard Inc. v. Pfizer Inc.,* 828 F.2d 734, 737, 740–41 (Fed.Cir.1987) (marketing plans, pricing information); *Gelb,* 813 F.Supp. at 1034–35 (revenue information); *see also Gohler v. Wood,* 162 F.R.D. 691, 693–94 (D.Utah 1995) (audit practice manuals); *Tonnemacher v. Sasak,* 155 F.R.D. 193, 195 (D.Ariz.1994) ("[I]nternal manuals are highly confidential and constitute proprietary trade secrets.").

■ Although such information falls into the category of traditionally protected material, whether it merits protection in any particular case depends upon: "(1) the extent to which information is known outside the business; (2) the extent to which information is known to those inside the business; (3) the measures taken to guard the secrecy of the information; and (4) the value of the information to the business and its competitors." *Sullivan Marketing, Inc. v. Valassis Communications, Inc.,* No. 93 Civ. 6350, 1994 WL 177795, at *2 (S.D.N.Y. May 5, 1994) (citing *Reliance Insurance Co. v. Barron's,* 428 F.Supp. 200, 203 (S.D.N.Y.1977)).

■ By these standards, BNY has made a specific showing that it is entitled to a protective order. BNY's manuals are disseminated outside the bank only with the approval of the senior officer in charge of the relevant department. Patterson Aff. ¶ 6; BNY Opposition Memo at 16. Within BNY, the information is provided only to those employees who require access to each document to perform their assigned tasks. Patterson Aff. ¶ 7; BNY Opposition Memo at 16. As indicated, BNY has invested significant time and money in developing the manuals and ensuring the secrecy of the information contained in them. Finally, knowledge of BNY's internal auditing policies and procedures would diminish BNY's competitive edge, confer on its competitors an unwarranted advantage in the industry, and furnish a potential avenue for fraud by third parties. Patterson Aff. ¶ 8; BNY Opposition Memo at

16. I therefore conclude that the Disputed Documents constitute confidential and proprietary information, the unprotected disclosure of which would likely be harmful to BNY's business.

■ The critical issue in fashioning the protective order is whether it is necessary to restrict dissemination of the Disputed Documents to counsel, their staff, and the Court, or whether experts and consultants used by DIB should be permitted unlimited access as well. BNY's proposal for disclosing confidential information requires DIB to provide BNY with the names of those defense experts or consultants who will be shown the Disputed Documents. BNY Opposition Memo at 11. BNY may then object to the individual named, after which DIB must seek relief from this Court to permit its expert or consultant to have access to the Disputed Documents. BNY Opposition Memo at 11–12. DIB is not required to provide BNY with the names of all if its experts and consultants, but merely those who will have access to the Disputed Documents and the information they contain. Finally, BNY has agreed to include in any Confidentiality Order a clause indicating that "it would not contact, depose or call at trial any expert of DIB's who has been shown the [materials], but who is not designated for trial." BNY Opposition Memo at 12.

DIB asserts that any procedure by which it must report the name of its expert or consultant to BNY before the expert has an opportunity to review the Disputed Documents would provide BNY with an unjustified "veto power" over DIB's choice of experts. Moreover, DIB argues that Rule 26 specifically provides that a party need not identify non-testifying experts to its adversary or permit discovery of those experts, and that such identification "could well provide BNY with information regarding DIB's preparation and themes of its case." Reply Memorandum of Law of the Deposit Insurance Board in Further Support of its Motion to Compel the Production of Documents from and for Sanctions against Plaintiff The Bank

of New York ("DIB Reply Memo") at 20.[2]

While Rule 26 does not permit unfettered discovery of non-testifying experts, it also does not prohibit the identification of such experts where "exceptional circumstances" exist. *See* Rule 26(b)(4)(B). As discussed above, given the confidential nature of the Disputed Documents and the type of economic injury to which BNY could be exposed as a result of their unwarranted disclosure to competitors, such exceptional circumstances are present in this case.

Furthermore, in fashioning a protective order, "[t]he grant and nature of protection is singularly within the discretion of the district court." *Dove v. Atlantic Capital Corp.*, 963 F.2d 15, 19 (2d Cir.1992) (quoting *Galella v. Onassis*, 487 F.2d 986, 997 (2d Cir.1973)). DIB has done little to substantiate its claim that it could not effectively litigate its case if required to identify to BNY those experts or consultants who will be shown the Disputed Documents. Nevertheless, DIB is correct that BNY must ultimately bear the burden of demonstrating to the Court that the proposed expert or consultant could actually harm BNY's business interests if he or she were permitted to review the Disputed Documents.[3]

Accordingly, BNY shall produce the Disputed Documents to DIB in their entirety. However, DIB must identify to BNY those experts or consultants to whom DIB plans to show the Disputed Documents prior to any actual disclosure of the documents. If BNY objects to the expert, it must inform the Court in writing of the reasons for the objection. BNY shall not contact, depose, or call at trial any expert or consultant of DIB who is shown the material, but who is not designated for trial. The parties shall submit to the Court within ten (10) days a proposed Confidentiality Order that conforms to these findings, or, if the parties cannot agree to the terms of such an Order, each shall submit a separate proposal.

### 2. *The Deposition Documents*

DIB next asserts that BNY has failed to produce numerous documents requested orally during the depositions of various witnesses between July 1996 and January 1997. *See* DIB Supporting Memo at 22–24. BNY counters that it has indeed produced all of the requested documents with the exception of performance evaluations of Constance Thatcher and Alfred Bacchi authored by William Williams. *See* BNY Opposition Memo at 12–13; Patterson Aff. ¶ 34. These documents are reasonably related to DIB's claims that BNY employees did not follow internal policies and procedures with respect to the Pledge Agreement, and BNY shall therefore produce them.

Finally, I do not find that sanctions against BNY are warranted concerning the Deposition Documents, as there is no indication that BNY has unjustifiably resisted this discovery.

### 3. *The Deposition Witnesses*

DIB contends that the two Deposition Witnesses produced by DIB to testify about the late production of portions of the Operations Manual and various other documents proved to be inadequate for purposes of Rule 30(b)(6) of the Federal Rules of Civil Procedure. According to DIB, George Krol and Stephen Polito lacked specific knowledge about the issues in question and were illprepared for their depositions.

It is impossible to characterize DIB's requests for the Deposition Witnesses as notice pursuant to Rule 30(b)(6). The documents proffered by DIB that purported-

---

**2.** According to DIB, a party objecting to an opponent's designated trial expert must demonstrate that it will suffer "specific harm" as a result of the testimony. DIB Reply Memo at 18 (citing *Stanford v. Kuwait Airways Corp.*, No. 85 Civ. 0477, 1989 WL 297860, at *1 (S.D.N.Y. July 10, 1989), and *Turbine Components Corp. v. Sequa Corp.*, No. 91 Civ. 1752, 1992 WL 6196, at *1 (S.D.N.Y. Jan.3, 1992)). However valid that proposition, it is irrelevant in the context of the instant case. Here, the issue is whether a party can be ordered to provide the names of proposed experts or consultants to its adversary during discovery, not the burden of proof that a party must satisfy when objecting to the designation of an already disclosed expert as a witness for trial.

**3.** Because BNY bears this burden, it should also be responsible for seeking relief from the Court when it objects to submitting documents to a designated consultant.

ly embody the Rule 30(b)(6) notice are more aptly described as informal requests between counsel. *See* Letters of Jordan Siev dated October 16, 1996 and October 21, 1996, and Letter of Richard Haddad dated October 21, 1996, attached as Exhs. 36, 38, and 37, respectively, to Siev Supporting Aff. It is not enough that DIB "stated [to BNY] its desire to discover" why the various documents at issue were not previously produced. Counsel is well aware that only proper notice pursuant to Rule 30(b)(6) is sufficient. Thus, BNY cannot be deemed to have violated Rule 30(b)(6), and sanctions are inappropriate.

Moreover, in my Order dated December 13, 1996, I instructed the parties to complete whatever depositions of BNY witnesses they sought to conduct by January 3, 1997 in order to provide the parties with the opportunity to file simultaneously their motions to compel. At that time, I made no determination of the appropriateness of deposing witnesses concerning BNY's production of the documents in question, leaving that issue for the parties to decide. It is now apparent that deposing such witnesses would serve no purpose in furthering the resolution of this case or providing DIB with information that would be relevant beyond the boundaries of the instant motion. Therefore, DIB shall take no further depositions of BNY witnesses regarding the production of documents that were the subject of the current motion.

### B. *BNY's Motion*

BNY is seeking to compel the production of the following documents: (1) documents in the possession of Stanbic Bank Tanzania Limited ("Stanbic"); (2) categories of documents identified in my August 30, 1996 Order;[4] (3) specific documents identified at depositions or in other documents; (4) documents in the possession of Coopers & Lybrand; (5) Document No. 35 in DIB's Amended Privilege Log;[5] and (6) certain documents relating to communications made by Meridien Tanzania management for

which DIB asserted the attorney-client privilege. *See* Memorandum of Law of The Bank of New York and JCPL Leasing Corp. in Support of their Motion for Entry of Default Judgment due to, *inter alia*, Failure to Comply with Prior Discovery Order, or, in the Alternative, to Compel Production and for Sanctions ("BNY Supporting Memo") at 15–41. BNY also claims that DIB failed to comply with its Rule 30(b)(6) obligations by failing to designate a witness capable of testifying about DIB's document production. Accordingly, BNY requests that the Court sanction DIB pursuant to Rule 37 by entering a default judgment against it or, alternatively, by entering favorable evidentiary rulings with respect to the Pledge Agreement and by requiring DIB to produce various witnesses for deposition. As a specific remedy for DIB's alleged failure to comply with Rule 30(b)(6), BNY requests that the Court preclude DIB from submitting affidavits that purportedly establish DIB's good faith discovery efforts.

### 1. *Documents in the Possession of Stanbic*

BNY is seeking to compel DIB to produce various documents in the possession of Stanbic, Meridien Tanzania's successor-in-interest. DIB argues that it cannot be required to produce the materials sought by BNY pursuant to Rule 34 of the Federal Rules of Civil Procedure because they are not within DIB's "possession, control, or custody." *See* Memorandum of Law of the Deposit Insurance Board in Opposition to the Motion by Plaintiffs to Compel the Production of Documents from and for Sanctions against the Deposit Insurance Board ("DIB Opposition Memo") at 33. Under Rule 34, however, "control" does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action. *See, e.g., In re NASDAQ Market–Makers*

---

**4.** The August 30, 1996 Order is attached as Exhibit 1 to the Affidavit of Richard G. Haddad in Support of Motion for Entry of Default Judgment due to Failure to Comply with Discovery Order or, in the Alternative, to Compel Production and

for Sanctions dated December 13, 1996 ("Haddad Aff.").

**5.** The Amended Privilege Log is attached as Exhibit 15 to the Haddad Aff.

*Antitrust Litigation,* 169 F.R.D. 493, 530 (S.D.N.Y.1996) (citing *Golden Trade S.r.L. v. Lee Apparel Co.,* 143 F.R.D. 514, 525 (S.D.N.Y.1992); *Scott v. Arex, Inc.,* 124 F.R.D. 39, 41 (D.Conn.1989)). *See also M.L.C., Inc. v. North American Philips Corp.,* 109 F.R.D. 134, 136 (S.D.N.Y.1986). DIB asserts that the documents are in the possession, control, or custody of Stanbic, a privately-held and independent legal entity in Tanzania, and that DIB has neither the legal right nor the practical ability to obtain the documents. DIB Opposition Memo at 33–35. "In the face of a denial by a party that it has possession, custody or control of documents, the discovering party must make an adequate showing to overcome this assertion." *Golden Trade,* 143 F.R.D. at 525 n. 7 (citation omitted). BNY contends that an assignee of a claim cannot refuse to produce documents in the possession of the assignor where the assignee, as the party to the litigation, has demonstrated a practical ability to obtain the documents from the assignor, or where proper discovery would otherwise be frustrated. BNY Supporting Memo at 32–33. Thus, in order to evaluate whether DIB has the practical ability to obtain documents which Stanbic has in its possession—thereby subjecting DIB to an order to compel—I must examine the relationship between Meridien Tanzania, Stanbic, and DIB.

According to Simon Matafu, an officer of DIB:

> The DIB is responsible for insuring customer deposits at banks and financial institutions in Tanzania. The DIB is charged with the administration of the [Deposit Insurance Fund] which, as its name suggests, is a fund whose purpose is to replace insured customer deposits at Tanzanian banks and financial institutions in the event that any bank or financial institution cannot repay the deposits.

*See* Affidavit of Simon C. Matafu in Opposition to the Motion by Plaintiffs to Compel the Production of Documents from and for Sanctions against the Deposit Insurance Board dated January 31, 1997 ("Matafu Aff.") ¶ 2,

annexed to the Affidavit of Jordan W. Siev in Opposition to the Motion by Plaintiffs to Compel the Production of Documents from and for Sanctions against The Deposit Insurance Board dated February 3, 1997 ("Siev Opposing Aff."). The Bank of Tanzania ("BOT") is the central banking authority in Tanzania. Matafu Aff. ¶ 3. In April 1995, BOT took over the management of Meridien Tanzania's operations. DIB Opposition Memo at 5. Pursuant to an order of the High Court of Tanzania dated July 11, 1995, Meridien Tanzania was reorganized with SBIC Africa Holding Ltd. ("SBIC") as its sole beneficial shareholder, and subsequently changed its name to Stanbic Bank Tanzania Limited. Matafu Aff. ¶ 4.

During the 1995 reorganization, DIB was well aware that it would be receiving an assignment of Meridien Tanzania's rights in this case. For example, in a Stipulation and Order dated August 28, 1995, counsel for DIB appeared on behalf of Meridien Tanzania to request an extension for the bank's time to answer. In that Stipulation, DIB was specifically referred to as the "assignee" of Meridien Tanzania. DIB itself appeared to request additional time to answer on October 3, 1995. Moreover, as part of the 1995 reorganization, DIB "paid substantial sums to Stanbic to restore [Meridien Tanzania's] balance sheet.... In exchange for this payment, DIB received an assignment of [Meridien Tanzania's/Stanbic's] claims for recovery of all lost and/or misappropriated funds." Matafu Aff. ¶ 5. Although the assignment did not occur until July 25, 1996,[6] almost one year after the High Court of Tanzania's determination and the filing of the original complaint in this action, DIB certainly was aware as early as the spring of 1995 that it would be a party to this action. Undoubtedly, DIB also knew that most of the documents it would need to defend itself against BNY's claims—and to prosecute Meridien Tanzania's counterclaims against the plaintiff—were in the files of Stanbic, since Stanbic helped manage Meridien Tanzania during the 1995 reorganization and received all of Meridien Tanzania's existing records during

---

**6.** *See* Assignment dated July 25, 1996 (the "Assignment"), attached as Exh. 9 to the Haddad Aff.

that period, including its former operating files. See DIB Opposition Memo at 11. Incredibly, although DIB planned to take the place of Meridien Tanzania/Stanbic in this case, the Assignment contains no explicit assurance that DIB would have the ability to obtain all of the documents necessary to satisfy its discovery obligations under Rule 34.

As for Meridien Tanzania/Stanbic, the Assignment seemingly permitted it to abandon the responsibility for producing its own documents in discovery after it had already exercised its discovery rights for almost a year without hindrance. Moreover, Meridien Tanzania/Stanbic received the full benefit of the litigation by selling its interest in the case to DIB through the Assignment.[7] Thus, while it is true that the documents which BNY seeks may be in Stanbic's possession, that state of affairs came into being only after Meridien Tanzania/Stanbic and DIB executed an assignment one year into this action.

■ Courts are cautious not to let the requirements of Rule 34 lead to an unjust result. For instance,

[i]t is not unusual for documents in the possession of a third party, closely connected to the litigation, to be subject to a Rule 34 request. For example, document requests against a non-party insurer have been upheld on the ground that the insurer is closely akin to a party .... [and] the assignee of a patent may be subject to discovery as a party.... These cases are premised on the rationale that a third party with a substantial interest in the litigation cannot be allowed to frustrate the

rules of discovery to the disadvantage of a party. (citations omitted).

*Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 33–34 (S.D.N.Y.1984).[8] Similarly, in *In re Infant Formula Antitrust Litigation*, No. MDL 878, 1992 WL 503465, at \*9–\*10 (N.D.Fla. Jan.13, 1992), the Court stated that:

[t]reatment of both assignor and assignee as parties for discovery ... is proper when to do otherwise would frustrate discovery, *Natta v. Hogan*, 392 F.2d 686, 691 (10th Cir.1968), regardless of whether this frustration is intentional or not.... Although the "substantial interest" in the litigation held by the non-party has generally been financial, *In re Jee*, 104 B.R. 289, 295–96 (Bankr.C.D.Cal.1989), such a restricted reading of the requirement is unwarranted. "Otherwise a litigant by contracting with a third party could nullify and evade the rules of procedure." *Simper v. Trimble*, 9 F.R.D. 598, 600 (W.D.Mo.1949).

■ In light of these principles, it would be anomalous for Meridien Tanzania/Stanbic to have received the advantages of discovery during the year prior to the Assignment while leaving BNY with no avenue to pursue the information it needs to fully and fairly litigate this case. Clearly, Stanbic and its predecessor-in-interest Meridien Tanzania had a substantial interest in this case from the outset—at least $15.15 million allegedly seized without justification by BNY—which was sold to DIB one year after this action began. Thus, although Stanbic does not technically maintain an interest in the case at this time, that circumstance should not work

---

7. The Assignment states on its face that Stanbic received consideration from DIB for the transaction.

8. In *Compagnie Francaise*, the court held that the defendant should be permitted discovery from the French government where the plaintiff was deemed to be the agent of the government by virtue of the government's receipt of any award obtained by plaintiff in the action. The court deemed the possibility of recovering an award a substantial interest in the litigation.

Because discovery was sought from a foreign sovereign, the court held that the interests of comity and international law required the defendant first to attempt to obtain the documents

sought through Hague Convention procedures. *Compagnie Francaise*, 105 F.R.D. at 35–36. Nevertheless, the court noted that "[s]hould this prove to be a futile gesture, defendant is invited back to this Court to make a motion for an order compelling [the plaintiff] to produce the [French] Ministry's documents." *Id.* at 36. In this case, however, BNY is not seeking to compel discovery from the Tanzanian government or from any of its agencies or instrumentalities other than DIB. BNY is requesting production of relevant documents from a privately-held foreign bank, and thus issues of comity and international law, while obviously pertinent, are not conclusive.

to disadvantage BNY and to frustrate BNY's right to discover documents in Stanbic's possession.

In addition, DIB cannot be permitted to circumvent the rules of discovery by engaging in conduct during the litigation that eliminates its responsibility to produce responsive documents to an opposing party. DIB was on notice in 1995 that it would have far-reaching discovery obligations in this case, obligations that certainly extended to the files of the very entity that it would eventually replace. Yet, DIB entered this case through an assignment that provided it with no means whatsoever to obtain from the assignor those documents necessary to fulfill its Rule 34 responsibilities.

Furthermore, DIB has been able to obtain documents from Stanbic when it has requested them, and Stanbic appears to be fully cooperating with DIB's requests by searching for and turning over relevant documents from its files. DIB Opposition Memo at 23 ("Stanbic has stated that it has been searching for such documents, will continue its search, and will produce any responsive documents once it completes its search."). In *M.L.C.*, 109 F.R.D. at 138–39, the court required the corporate defendants to produce documents in a related corporation's possession when an attorney who had jointly represented the three entities in a prior action produced the documents in that earlier litigation. Although the related corporation was a non-party, the court concluded that the defendants had a right to obtain the documents from the common attorney for purposes of satisfying the current plaintiff's document requests. *Id.* Moreover, the court found that the defendants had control over the documents because of their "ability to easily obtain the[m] when it was in their interest to do so." *Id.* at 138. This ability was demonstrated when the non-party corporation repeatedly turned over various critical documents at the request of the corporate

defendants. *Id.* at 138. DIB has shown the same ability here to retrieve documents from Stanbic.

It would be patently unfair if DIB were able to continue to discover relevant information from BNY while relegating BNY to seek information from Stanbic as a non-party. DIB shall therefore produce all documents relevant to the issues in this action that are in Stanbic's possession. DIB shall produce such documents to BNY within thirty (30) days. Since I had not previously addressed this issue, and since it raises novel questions, no sanctions are warranted.

### 2. *Rule 30(b)(6) Deposition*

BNY asserts that DIB did not comply with the bank's Rule 30(b)(6) deposition notice because DIB's designated witness was wholly inadequate. According to BNY, Basil Mbanga, the individual charged by DIB and BOT with coordinating the collection of documents for production to BNY, failed to provide testimony regarding the following issues: (1) the organization and maintenance of files at DIB and BOT; (2) DIB and BOT's document retention policy; and (3) the method and manner in which documents were collected, reviewed, and produced to BNY pursuant to BNY's discovery requests. BNY Supporting Memo at 36–39. As a result, BNY requests that the Court sanction DIB pursuant to Rule 37(b)(2)(B) by considering only the testimony of Mr. Mbanga as proof of DIB's document production efforts in this case, and by precluding DIB from offering any evidence on those efforts in the form of additional affidavits. BNY contends that it would be unfair to allow DIB to proffer the affidavits of witnesses attesting to DIB's good faith document production efforts in this case in the face of the complete failure of its Rule 30(b)(6) designee to testify adequately on this same topic. BNY supporting Memo at 38.[9]

---

**9.** BNY also contends that DIB should be sanctioned for failing to designate a Rule 30(b)(6) witness with knowledge about the organization and maintenance of files at Meridien Tanzania. *See* BNY Supporting Memo at 37 n. 11. DIB asserts that it should not be sanctioned since it does not have control over an individual with such knowledge. *See* DIB Opposition Memo at

44 n. 28. Because I am not imposing sanctions upon DIB for its failure to produce documents in the possession of Stanbic, it would be inappropriate to sanction DIB for failure to comply with BNY's deposition notice. Moreover, as discussed with reference to DIB's request for further depositions, there is no legitimate reason for the parties to delay substantive discovery in order to

### a. *Rule 30(b)(6) Requirements*

Rule 30(b)(6) provides in its entirety:

A party may in the party's notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth for each person designated, the matter on which the person will testify. A subpoena shall advise a non-party organization of its duty to make such a designation. The persons so designated shall testify as to matters known or reasonably available to the organization. This subdivision (b)(6) does not preclude taking a deposition by any other procedure authorized in these rules.

██ While Rule 30(b)(6) "is not designed to be a memory contest[,]" *EEOC v. American International Group, Inc.,* No. 93 Civ. 6390, 1994 WL 376052, at *3 (S.D.N.Y. July 18, 1994), the deponent must be both knowledgeable about a given area and prepared to give complete and binding answers on behalf of the organization. *Federal Deposit Insurance Corp. v. Butcher,* 116 F.R.D. 196, 201 (1986), *aff'd,* 116 F.R.D. 203 (E.D.Tenn.1987).

### b. *Adequacy of Mr. Mbanga's Testimony*

The first portion of Mr. Mbanga's testimony concerned his knowledge of the Pledge Agreement and his communications with Mr. Thomas. Following that line of questioning, Mr. Mbanga was asked about the organization and maintenance of files at BOT and that entity's document retention policies. *See* Deposition of Basil Mbanga dated November 21, 1996 ("Mbanga Dep.") at 145, annexed to the Plaintiffs' Motion. Mr. Mbanga stated that no current document retention policy existed, but that BOT's gov-

ernor had delegated to him the responsibility for conducting a preliminary study into the creation of such a policy. Mbanga Dep. at 146–47. Mr. Mbanga also explained that BOT officials believed that its documents were not maintained with proper confidentiality controls, and thus sent him to visit other African banks to examine their methods of preserving document secrecy. Mbanga Dep. at 148–51. Therefore, Mr. Mbanga demonstrated that he had personal knowledge on at least one of the topics about which he was supposed to testify.

Regarding the method and manner in which documents were collected, reviewed, and produced to BNY, it is clear that Mr. Mbanga was utterly unprepared to discuss this issue during his deposition. Mr. Mbanga could only recount (1) that he had been instructed by A.H.M. Mtengeti, BOT's Secretary and general counsel, to collect all documents from BOT concerning the operations of Meridien Tanzania (Mbanga Dep. at 190), (2) that he then instructed John Mwasilu, a BOT attorney, as well as John Montgomery and Othman Kitine, two BOT employees, to surrender all copies of documents (Mbanga Dep. at 195), (3) that he instructed Mr. Mwasilu to obtain the files of Stanbic Bank (Mbanga Dep. at 195), and (4) that he turned over documents to Mr. Mtengeti as he received them. (Mbanga Dep. at 194). Mr. Mbanga was unable to provide a substantive response to virtually every other question posed to him on this topic, including the type of instructions he received from Mr. Mtengeti (Mbanga Dep. at 190), whether he had ever seen a list of documents requested by either BNY or DIB (Mbanga Dep. at 209), the number or types of documents Messrs. Mwasilu, Montgomery, and Kitine produced (Mbanga Dep. at 198–203), whether Mr. Mwasilu actually obtained documents from Stanbic (Mbanga Dep. at 212), and whether he had ever looked for a series of documents evidencing the relationship between Meridien Tanzania, BOT, and BNY during the time

---

probe disputed areas of document production through depositions. Therefore, BNY shall take no further depositions of DIB witnesses regarding the production of documents that were the subject of the current motion. However, if DIB fails to produce documents in Stanbic's posses-

sion, I shall require DIB to designate a Rule 30(b)(6) witness who can testify as to all matters known or reasonably available to DIB involving the organization and maintenance of files at Meridien Tanzania/Stanbic.

period relevant to the litigation (Mbanga Dep. at 260–271). Indeed, Mr. Mbanga could not even testify as to the purpose of the deposition or the intended scope of his testimony. (Mbanga Dep. at 239–241).

DIB's woeful preparation of Mr. Mbanga is underscored by the affidavits of Messrs. Matafu, Mwasilu, Mtengeti, and Mitchell proffered by DIB to attest to its good faith efforts to comply with BNY's discovery requests. *See* Matafu Aff., Affidavit of John Mwasilu dated January 31, 1997, Affidavit of A.H.M. Mtengeti dated January 31, 1997, and Affidavit of Ian J. Mitchell dated January 31, 1997, attached to the Siev Opposing Aff. These affidavits describe with somewhat more clarity many of the details of production to BNY about which Mr. Mbanga could not respond, such as the types of documents searched for and where those searches were conducted. *See, e.g.*, Mwasilu Aff. ¶¶ 5–7; Matafu Aff. ¶¶ 13–19.

 Pursuant to Rule 30(b)(6), the deponent "must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed ... as to the relevant subject matters." *Securities and Exchange Commission v. Morelli*, 143 F.R.D. 42, 45 (S.D.N.Y. 1992) (quoting *Mitsui & Co. (U.S.A.) v. Puerto Rico Water Resources Authority*, 93 F.R.D. 62, 67 (D.P.R.1981)); *see also United States v. Taylor*, 166 F.R.D. 356, 361, *aff'd*, 166 F.R.D. 367 (M.D.N.C.1996) ("[T]he duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved.") (citations omitted). The deponent must prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources. *Id.* (citing *Ierardi v. Lorillard, Inc.*, Civ. A. No. 90–7049, 1991 WL 158911, at *3 (E.D.Pa. Aug.13, 1991)).

 In this case, although Mr. Mbanga may have been the individual best situated to testify as to the production of documents to BNY, DIB's complete failure to prepare him for the deposition rendered his testimony meaningless. Mr. Mbanga had no ability to recall most of the events surrounding document production to BNY, an endeavor over which he had personal responsibility. Indeed, even where a witness does not have first-hand knowledge and involvement in the underlying transaction, the focus remains on the preparedness of the witness. *Morelli*, 143 F.R.D. at 45 (collecting cases). Certainly, DIB could have designated as a witness one or more of the four knowledgeable affiants for purposes of satisfying its obligations under Rule 30(b)(6), or it could have provided Mr. Mbanga with their accounts of document production as a means of preparing him for the deposition. Mr. Mbanga was therefore an inadequate Rule 30(b)(6) witness.

### c. *Sanctions*

 Pursuant to Rule 37(d), the Court can impose sanctions where a party or person designated under Rule 30(b)(6) fails "to appear before the officer who is to take the deposition, after being served with proper notice." "Producing an unprepared witness is tantamount to a failure to appear." *Taylor*, 166 F.R.D. at 363 (citing *Resolution Trust Corp. v. Southern Union*, 985 F.2d 196, 197 (5th Cir.1993)). The Rule provides the Court with the discretion to impose a range of sanctions that range from the imposition of costs to the entry of a default judgment. Fed.R.Civ.P. 37(b)(2). "In order for the Court to impose sanctions, the inadequacies in a deponent's testimony must be egregious and not merely lacking in desired specificity in discrete areas." *Zappia Middle East Construction Co. v. Abu Dhabi*, No. 94 Civ. 1942, 1995 WL 686715, at *8 (S.D.N.Y. Nov. 17, 1995).

 In this case, Mr. Mbanga was wholly unable to render testimony regarding one of the three subject areas for which he was designated—the method and manner in which documents were collected, reviewed, and produced to BNY pursuant to BNY's document requests. I find that his performance amounts to non-appearance, which could warrant the imposition of sanctions. However, because sanctions that prohibit a

party from introducing evidence are typically reserved for only flagrant discovery abuses, BNY is not entitled to an order declaring Mr. Mbanga's deposition testimony to be the sole proof of DIB's document production for purposes of this motion, or to an order precluding DIB from submitting the affidavits of Messrs. Mtengeti, Matafu, Masilu, and Mitchell as proof of DIB's production efforts in this case.

In addition, while a sanction awarding costs on the instant motion might be appropriate, such an award would be limited to the expenses associated with litigating the issue of DIB's Rule 30(b)(6) violation, and not any of the other matters raised by BNY. Given the scope and complexity of the instant motion and the fact that costs for litigating this single issue are *de minimis*, it serves no practical purpose for the parties to expend additional resources in attempting to calculate a precise figure. Therefore, I will impose no sanctions against DIB in connection with the Mbanga deposition.[10]

### 3. *Documents Identified in Depositions or in other Documents*

■ BNY asserts that there is a host of documents that were identified at depositions or in other documents that have not been produced. BNY Supporting Memo at 22–31. Many of these documents, such as telexes, letter of credit files, statements of account, employment records, and various correspondence, relate to the activities of Meridien Tanzania/Stanbic and may be in Stanbic's possession. They must be produced by DIB as discussed above. As for the other documents BNY demands, DIB has proffered the affidavits of Messrs. Matafu, Mwasilu, Mitchell, and Siev to establish that these documents either do not exist, exist but were not located, or exist and were already produced to BNY. "Under ordinary circumstances, a party's good faith averment that the items sought simply do not exist, or are not in his possession, custody or control, should resolve the issue of failure of production...." *Doe I v. Karadzic*, No. 93 Civ. 878, 1997 WL 45515, at *6 (S.D.N.Y. Feb. 4,

1997) (quoting *Zervos v. S.S. Sam Houston*, 79 F.R.D. 593, 595 (S.D.N.Y.1978)). If BNY believes that deposition witnesses provided ambiguous testimony regarding the existence, review, or production of various documents, it is not foreclosed from pursuing different avenues to obtain information it deems more responsive. Otherwise, I find no evidence justifying the issuance of an order compelling DIB to produce these other documents.

### 4. *Categories of Documents Identified in the August 30, 1996 Order*

Following BNY's first motion to compel in this case, I issued the August 30, 1996 Order, in which I instructed DIB to produce:

1. [A]ll documents requested in items 8, 26, and 27 of Plaintiffs' First Request for the Production of Documents from Defendant [Meridien Tanzania], as well as any employment contracts or agreements for P.S. Thomas, F.G.E. Tate, B. Ninan, and E.N. Mafuru.

2. [A]ll documents requested in items 18, 19, 23, 24, 36, 48, 49, 50, 51, 52, 54, 55, 56, 60, 61, 66, 67, and 69 of Plaintiffs' Document Request, as those items are limited in the letter dated July 3, 1996 from Richard G. Haddad to Jordan W. Siev.

*See* August 30, 1996 Order. BNY claims that testimony by various DIB witnesses establishes that many documents responsive to BNY's requests exist but have not been produced by DIB in contravention of my Order.

### a. *Item 26—Documents in the Possession of DIB or other Tanzanian Government Entities that Relate to Mr. Thomas' Prosecution*

BNY contends that DIB has failed to produce documents responsive to Item 26 of BNY's First Request for Production of Documents. Among other things, BNY requested the disclosure of a list containing the names of Meridien Tanzania's management team

---

10. In any event, monetary sanctions would not include the costs that BNY incurred in deposing Mr. Mbanga. As discussed above, Mr. Mbanga provided sufficient testimony on the second topic described in the notice: the organization, maintenance, and retention of documents at BOT.

that was provided to Mr. Mbanga by I. Rashidi, the governor of BOT. Mr. Mbanga's testimony does not reveal that either he or DIB is in possession of that list. See Mbanga Dep. at 36–37, 50, 174–75. However, there is no indication that a search for the list was conducted in the files of Meridien Tanzania/Stanbic.

In addition, BNY contends that DIB has failed to produce documents concerning any legal action taken against Mr. Thomas. BNY Supporting Memo at 19. DIB responds that it searched its files and the files of BOT for such documents, but did not locate any. DIB Opposing Memo at 17; Matafu Aff. ¶ 15. Once again there is no representation that DIB conducted a search for these documents in the files of Meridien Tanzania/Stanbic. Therefore, DIB shall certify within thirty (30) days of this Memorandum and Order that it has searched the files of Meridien Tanzania/Stanbic for (1) the list of names described by Mr. Mbanga, and (2) any documents relating to any legal action taken against Mr. Thomas by any governmental or banking entity within Tanzania.

There is no basis for compelling DIB to produce these documents if they indeed exist but are in the possession of another Tanzanian government entity. Absent a showing that, for purposes of this litigation, DIB is acting as the agent of another government entity in possession of the documents, is somehow shielding that entity from discovery obligations, or will turn over to that entity any judgment awarded, this Court can neither require DIB to produce the documents nor sanction DIB for the failure to do so. *See Compagnie Francaise,* 105 F.R.D. at 33–35 (citing *Ghana Supply Commission v. New England Power Co.,* 83 F.R.D. 586, 591–92 (D.Mass.1979); *Soletanche and Rodio, Inc. v. Brown & Lambrecht Earth Movers, Inc.,* 99 F.R.D. 269, 270–72 (N.D.Ill.1983)).[11]

11. BNY cites examples in its papers where the Bank of Tanzania was able to obtain immediate results when it made requests for action to the Tanzanian Immigration Department and the Tanzanian Police. *See* Reply Memorandum of Law of The Bank of New York and JCPL Leasing Corp. in Further Support of their Motion for Entry of a Default Judgment due to, *inter alia,* Failure to Comply with Prior Discovery Order, or, in the Alternative, to Compel Production and for Sanctions ("BNY Reply Memo") at 8–9. Those examples do not constitute evidence of an agency relationship between DIB and the other government entities.

### b. Items 48, 49, 50, 51 and 52— Documents Concerning Meridien Tanzania's License Application

BNY asserts that "documents concerning the purpose of the application for Meridien Tanzania's license as well as the revocation of any license ... have not been produced." BNY Supporting Memo at 22. DIB has certified that it has provided all responsive documents to BNY, and that any additional documentation has been searched for by DIB and BOT but has not been located. Matafu Aff. ¶¶ 15, 21. To the extent that such documents are in the possession of Stanbic, DIB shall produce them.

### c. Items 23, 24, 54, 55, 56, 66, and 67— Documents Evidencing Payment by Meridien Tanzania of the Debt of Other Entities

BNY claims that DIB has produced only one document in response to requests for documents concerning the payment by Meridien Tanzania of the debts of any other entity. BNY Supporting Memo at 20–21. DIB states that it "has searched for and produced all such documents in its possession, and has thus fully complied with this Court's Order with respect to those documents." DIB Opposing Memo at 19. However, DIB admits that "most of the documents requested by BNY would be in Stanbic's possession." DIB Opposing Memo at 19. For the reasons stated above, DIB must produce all such documents in the possession of Stanbic and shall certify within thirty (30) days that it has done so.

### 5. Documents in the Possession of Coopers & Lybrand

BNY argues that DIB should be ordered to produce all responsive documents of Meridien Tanzania or BOT in the possession of Coopers & Lybrand, Meridien Tanzania's former auditors. BNY Supporting Memo at 34. As discussed, DIB must produce documents in the possession of Stanbic.

Because Coopers & Lybrand were the auditors of Meridien Tanzania, Stanbic's predecessor-in-interest, DIB is deemed to have control over any documents in the possession of Coopers & Lybrand that relate to this action. "Financial records of the defendant in the possession of defendant's accountant are documents which defendant has the legal right to obtain." *Wardrip v. Hart*, 934 F.Supp. 1282, 1286 (D.Kan.1996); *see also Winston v. Alhadeff*, No. 83 C 3801, 1986 WL 4437, at *2 (N.D.Ill. Apr.7, 1986) ("Documents of a client given to an accountant are within the custody and control of the client since he has a right to demand their return."). Therefore, DIB shall produce all documents of DIB, Meridien Tanzania, Stanbic, and BOT related to this action that are in the possession of Coopers & Lybrand.

### 6. Document No. 35 in DIB's Amended Privilege Log

■ Document No. 35 in DIB's Amended Privilege Log is a handwritten memo from Mr. Mbanga to Mr. Mtengeti in Swahili with an English translation, which DIB withheld on the basis of the work product privilege. BNY claims that it is entitled to obtain this document which contains information related to the Pledge Agreement. I have reviewed the document *in camera* as well as the testimony of Mr. Mbanga, and I find that BNY is "unable without due hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3). During his deposition, Mr. Mbanga did not recall conducting an investigation into the Meridien Tanzania matter or preparing the document. Mbanga Dep. at 69–70, 83–85. The individual to whom the memo was sent, Mr. Mtengeti, will not be produced for deposition. BNY Supporting Memo at 39. There is no other method for BNY to obtain the information contained in the document. For those reasons, and because the document is relevant to the issues in this case, DIB shall produce it.

### 7. Documents Relating to Communications made by Meridien Tanzania Management for which DIB Asserted the Attorney–Client Privilege

BNY seeks documents 7, 8, and 10 on DIB's Privilege Log on the ground that they are not protected by the attorney-client privilege. BNY contends that Mr. Thomas and Frederick Tate, a former Meridien Tanzania employee, could not communicate freely with BOT since their names were on a list of individuals detained by the Tanzanian government. According to BNY, the goal behind the attorney-client privilege—to facilitate openness and full disclosure between attorney and client—would not be met if Messrs. Thomas and Tate felt compelled to talk to BOT counsel. However, BNY points to no evidence indicating that Messrs. Thomas and Tate were coerced to communicate with BOT. Therefore, these documents are subject to the attorney-client privilege and need not be disclosed. Additionally, I find no reason to issue an order compelling the reopening of the depositions of Messrs. Montgomery, Kitine, or Tate for the purpose of learning the substance of any conversations that anyone on the list of detained individuals may have had with respect to the pledge.

### 8. Request for Unfavorable Evidentiary Rulings

I have considered BNY's request for the imposition of sanctions against DIB in the form of various unfavorable evidentiary rulings, *see* BNY Supporting Memo at 41–43, and find that such relief is not warranted.

### C. Deposition of Oran Njeza

The final dispute concerns the site of Oran Njeza's deposition. Mr. Njeza was the Chief Accountant for Meridien Tanzania and he currently holds the same position with Stanbic. As discussed above, BNY argues that DIB controls Stanbic. Since Mr. Njeza is an employee of Stanbic, BNY contends that he is therefore a managing agent of DIB and can be compelled to appear for deposition in New York. *See generally In re Honda American Motor Co., Inc., Dealership Relations Litigation*, 168 F.R.D. 535, 537–38 (D.Md. 1996); *Trans Pacific Insurance Co. v. Trans–Pacific Insurance Co.*, 136 F.R.D. 385, 392 (E.D.Pa.1991). Moreover, BNY claims that it would be most efficient to

depose Mr. Njeza in New York since all counsel are located here.

Apparently assuming that it would be appropriate to hold the deposition in New York if Mr. Njeza were its managing agent, DIB argues that he does not have this status because Stanbic is not subject to DIB's control. *See generally United States v. Afram Lines (USA), Ltd.,* 159 F.R.D. 408, 415 (S.D.N.Y.1994) (defendant need not produce deposition witness where plaintiff failed to demonstrate that witness was subject to defendant's control and acted as its managing agent). However, DIB claims that it has acted to secure Stanbic's cooperation in this matter and has obtained Stanbic's consent to allow Mr. Njeza to appear for the deposition in London.

█ Regardless of whether Mr. Njeza is treated as a non-party or as a managing agent of Stanbic/DIB, he would normally be deposed at his residence or place of business. There is a general presumption that a non-resident defendant's deposition will be held where he or she resides or works. *Mill–Run Tours, Inc. v. Khashoggi,* 124 F.R.D. 547, 550 (S.D.N.Y.1989) (citing *Farquhar v. Shelden,* 116 F.R.D. 70, 72 (E.D.Mich.1987); *Pinkham v. Paul,* 91 F.R.D. 613, 614–15 (D.Me.1981); *General Leasing Co. v. Lawrence Photo–Graphic Supply, Inc.,* 84 F.R.D. 130, 131 (W.D.Mo.1979)). There is no dispute that Mr. Njeza lives and works in Tanzania. Thus, BNY would ordinarily be required to depose him there.

However, because courts retain substantial discretion to designate the site of a deposition, "the presumption appears to be merely a decision rule that facilitates determination when other relevant factors do not favor one side over the other." *Mill–Run,* 124 F.R.D. at 550. In this case, Mr. Njeza has agreed to leave Tanzania and appear for his deposition in London. While this location may not be the most convenient for counsel, it is a reasonable accommodation for Stanbic and Mr. Njeza, and other depositions in this case have been held there. Therefore, Mr. Njeza shall be deposed in London, and the parties shall use their best efforts to agree to a mutually convenient date.

BNY has agreed to pay Mr. Njeza's round-trip airfare to New York as well as accommodations at the same per diem agreed to for other DIB witnesses. BNY shall bear those costs for a deposition in London. Finally, although BNY and DIB each claim that the other should bear the expense of sending counsel to conduct Mr. Njeza's deposition in London, the most equitable solution is to award such costs to the prevailing party at the conclusion of the litigation.

*Conclusion*

For the foregoing reasons, DIB's motion to compel is granted to the extent that BNY shall produce the Disputed Documents in their entirety subject to a Confidentiality Order conforming to the guidelines discussed in Part A.1. BNY shall also produce all performance evaluations of Constance Thatcher and Alfred Bacchi authored by William Williams. No sanctions are imposed against BNY.

BNY's motion is granted to the extent that DIB shall produce all documents relevant to the issues in this action that are in the possession of Stanbic, including any documents responsive to BNY's prior document requests, documents identified at depositions or in other documents, documents identified in my August 30, 1996 Order, and documents in the possession of Coopers & Lybrand. DIB shall also produce Document No. 35 on its Amended Privilege Log. No sanctions are imposed against DIB.

Finally, the of Oran Njeza shall be conducted in London.

SO ORDERED.